FILED

1   Anthony Oliver, Plaintiff Pro Se
2   1717 McKinney Avenue, Suite # 700
    Dallas, Texas, 75202
3   (818) 624-2504 (telephone)
    (818) 227-5030 (facsimile)
4   Anthony.oliver29@rocketmail.com
5
6   James Kyle, Plaintiff Pro Se
    1400 Greenfield Avenue, # 140
7   El Cajon, California 92021
    (760) 622-4400 (telephone)
8   (818) 227-5030 (facsimile)
9

2017 JAN 11  PM 12: 50

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

10
11              **UNITED STATES DISTRICT COURT**
12              **CENTRAL DISTRICT OF CALIFORNIA**
13
14   ANTHONY OLIVER, an individual;        Case No.: **CV 17 - 00237** SVW (AJW)
     JAMES KYLE, an individual;
15                                         **COMPLAINT FOR DECLARATORY,**
                                           **INJUNCTIVE, OR OTHER RELIEF**
16              Plaintiffs,
17                                         **DEMAND FOR JURY TRIAL**
     vs.
18
19   SCRAM OF CALIFORNIA, INC., a
     California Corporation; ALCOHOL
20   MONITORING SYSTEMS, INC., a
     Delaware Corporation; EDMUND G.
21   BROWN, Jr., in his individual capacity
     and as GOVERNOR; KAMALA D.
22   HARRIS, in her individual capacity
     and as ATTORNEY GENERAL; and
23   DOES 1-10, inclusive.
24
25              Defendants.
26
27
28

PAID

JAN 11 2017

Clerk, US District Court
COURT 4612

-1-

Plaintiffs Anthony Oliver, ("hereafter Mr. Oliver or Plaintiffs") and James Kyle, ("hereafter Mr. Kyle or Plaintiffs"), complain of Defendants and allege:

## INTRODUCTION

1.    For the past seven plus years, the State of California, the Superior Court of California, the California Department of Corrections, as well as County, City, and State law enforcement agencies acting with the express consent of the current Governor, Edmund G. Brown, Jr., ("BROWN") and its Chief Law Officer, Kamala D. Harris, ("HARRIS"), had and still has a contract in place with two Corporations known as Scram of California, Inc., ("SCRAM") and its subsidiary Corporation Alcohol Monitoring Systems, Inc., ("AMS"). Defendants SCRAM and AMS produce a device known as the Secure Continuous Remote Alcohol Monitoring, ("hereafter SCRAM Device"), which is an ankle monitor that is very similar to that of a GPS ankle monitor. However, this particular ankle monitor is attached to a person's left leg and can monitor the sweat level of the person wearing the SCRAM Device to determine whether or not the wearer had or has consumed alcohol. Typically, criminal defendants who are often charged with a drunk driving related criminal case will be placed on the SCRAM Device.

2.    In or around January of 2007, the Defendants SCRAM and AMS had obtained written contracts with the State of California, and the Superior Court to provide certain offenders in the criminal justice system with SCRAM monitoring as a condition of a bond, probation, parole, or even own recognizance.

3.    Defendants SCRAM and AMS parade themselves around the State of California lurking for government contracts. In an elaborate attempt to gain these contracts, SCRAM and AMS advertises to the general public, the Government and the SCRAM and AMS customers that, among other things, the SCRAM Device was manufactured, designed, or created to determine if a person has consumed alcohol, and when the SCRAM Device detects alcohol, SCRAM and AMS also

1  advertise that the SCRAM Device can determine if the wearer consumed alcohol

2  or if the wearer tried on a body spray that contains alcohol, used tooth paste that

3  contains alcohol, or mouth wash. Neither of the two statements have any truth. As

4  a part of a money-making scheme that will likely be the next biggest Ponzi scheme

5  in the Country, Defendants SCRAM and AMS will continue to dupe people like

6  BROWN and HARRIS who knew, and still knows that the SCRAM Device is not

7  what SCRAM and AMS advertises.

8      4.    As a severe consequence of the faulty device produced by SCRAM

9  and AMS, and the intentional misrepresentations they make to City, County, State,

10  and government agencies nationwide, each year hundreds if not thousands of said

11  innocent people, Defendants, and people just trying to make it in life are returned

12  to incarceration based on facts that the SCRAM Device creates false consumption

13  and tamper reports. Further, SCRAM and AMS even admits to several agencies

14  that they do not maintenance their SCRAM Device for at least six (6) months to a

15  year.

16      5.    For these reasons, Plaintiffs ask this Court to enjoin, preliminarily and

17  permanently order the State Defendants to cease and desist any and all transactions

18  in the State of California, and the United States of America.

19                    **VENUE AND JURISDICTION**

20      6.    This case raises questions under the Constitution of the United States

21  and 42 U.S.C. § 1983, and thus this Court has jurisdiction over all claims for relief

22  pursuant to 28 U.S.C. § 1331.

23      7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because

24  the State Defendants resides in this district and all Corporate Defendants transact

25  business in this District. Venue is also proper in this Court because a substantial

26  part of the events giving rise to these claims occurred in this District.

27

28

PLAINTIFFS' COMPLAINT FOR DAMAGES

## NATURE OF DISPUTE

8.      This action pursuant to 42 U.S.C. § 1983 seeks (1) a declaration that the SCRAM and AMS alcohol ankle monitor is faulty, corrupt, and is a product that should be removed from the market. Further, the Corporate Defendants have designed a device that puts innocent people in jail, causes them to lose everything they own and simultaneously is unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, and (2) a preliminary and permanent injunction preventing the State Defendants from continuing their contracts with SCRAM and AMS.

9.      In an abundance of caution, and to the extent the State Defendants continued their contracts with SCRAM and AMS, Plaintiffs seek to prevent any continued and future harm to not only innocent people, but also the tax payers of the State of California. Often times, the tax payers must pick up the tab in the eyes of the Superior Court to pay for experts to testify just how corrupt and flawed the SCRAM Device really is, costing the tax payers hundreds of thousands of dollars in money each year all while SCRAM and AMS stuff their wallets with billions of dollars each year. Citizens of the State of California, including criminal Defendants and the Plaintiffs are denied their Equal Protection and Due Process Clauses of the Fourteenth Amendments to the United States Constitution every day as more often than not, a City, State, or Municipal Judge will often just issue a bench warrant for the Defendants arrest without even holding a hearing to determine whether or not the wearer of the SCRAM Device actually consumed alcohol. Defendants SCRAM and AMS are given special perks by being able to send letters, emails, and faxes directly to Judges across the United States seeking a bench warrant after furnishing the judge with a flawed and corrupt consumption report. Any other person sending those documents would be deemed to be having an illegal ex parte communication with a Judge.

10.     To enforce the rights afforded by the United States Constitution, the Plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 seeking declaratory and injunctive relief against the enforcement of the SCRAM and AMS contracts that are current with the State Defendants. Plaintiffs also seek to recover all of their costs, and expenses incurred in this action and any other relief that this Court may order.

## THE PARTIES

11.     Plaintiff Anthony Oliver, ("OLIVER") is a citizen of the State of Texas, resides in Dallas County, is over the age of eighteen years old and will be mentioned herein at all times.

12.     Plaintiff James Kyle, ("KYLE") is a citizen of the State of California, resides in Los County, is over the age of eighteen years old and will be mentioned herein at all times.

13.     Defendant, Scram of California, Inc., ("SCRAM") is a California corporation with its national headquarters located in Los Angeles, California. Defendant is a local distributer and provider of AMS's devices and services in this District, and elsewhere throughout California.

14.     Defendant, Alcohol Monitoring Systems, Inc., ("AMS") is a Delaware corporation with its national headquarters located in Littleton Colorado. Defendant AMS is a nationwide provider of alcohol monitoring devices and services to state and federal law enforcement agencies, courts, as well as any and other private entities such as rehabilitation centers. Defendant AMS is registered in California and provides alcohol monitoring services in California, including in this District, and elsewhere throughout the United States.

15.     Defendant Edmund G. Brown, ("BROWN") is the Governor of the State of California. In his official capacity, the Governor is the chief executive officer of the State of California. It is his responsibility to ensure that the laws of the State are properly enforced. The Governor maintains an office in Los Angeles,

California.

16. Defendant Kamala D. Harris, ("HARRIS") is the Attorney General of the State of California. In her official capacity, the Attorney General is the chief law officer of the State of California. It is her responsibility to ensure that the laws of the State are properly enforced. The Attorney General maintains an office in Los Angeles, California.

17. Plaintiffs is currently ignorant of the true name(s) and the capacities, whether individual, corporate, associate, or otherwise, of the Defendants sued herein under the fictious names DOES 1 through 10, inclusive, and therefore, sues such civil Defendants by such fictitious names. Plaintiffs will seek leave to amend this Complaint to allege the true names and capacities of said fictitiously named Doe Defendants is legally responsible in some manner for the events and is also sued pursuant to California Code of Civil Procedure 474.

18. Plaintiffs is informed and believes and thereon alleges that the Defendants, including the fictitious Doe Defendants, were at all times acting as actual agents, conspirators, ostensible agents, partners and/or joint ventures and their employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy, or enterprise, and with the express and/or implied permission, with all such knowledge, consent, authorization and ratification of their own co-Defendants however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contraction with the other allegations.

19. Whenever the Complaint refers to any act of the Defendants, the allegations shall be deemed to mean the act of those Defendants names in the particular cause of action, and each of them, acting individually, jointly and severally.

## STATEMENT OF THE FACTS

20.   Defendants are providers of alcohol monitoring services and devices to state and federal law enforcement agencies, courts, as well as various private entities.  The alcohol monitoring device used by Defendants is called the SCRAM Continuous Alcohol Monitoring system (the "SCRAM Device").

21.   The SCRAM Device is approximately the size of a deck of cards and is placed on the wearer's ankle using a strap. The Scram Device is a transdermal monitoring device that was designed to detect and record any instances when the wearer had consumed alcohol by detecting alcohol vapors caused by ingested alcohol diffusing through the skin. The majority of Defendants' business consists of providing alcohol monitoring services to individuals as part of court mandated rehabilitation programs, as a condition of probation or bond, or other purposes related to the criminal justice system.

22.   While Defendants are selected by state and federal agencies and courts to provide monitoring services for criminal defendants and other individuals who become involved in the criminal justice system, it is such individuals who are ultimately Defendants' customers and choose to purchase Defendants' alcohol monitoring service as an alternative form of monitoring offered by the state or federal agency or court. Defendants enter into private contracts with each such individual to provide them their alcohol monitoring services, and directly charge them a monthly fee. Defendants advertise their SCRAM Device as a cost-effective and accurate alternative for law enforcement agencies and courts to track the alcohol usage of at-risk individuals such as those charged with driving under the influence or other crimes relating to consumption of alcohol.  Specifically, the SCRAM Device is meant to be worn 24/7. The wearer is instructed to once a day connect the SCRAM Device to a special docking station connected to the internet to upload the monitoring data collected by the device throughout the day.

PLAINTIFFS' COMPLAINT FOR DAMAGES

23. Once the device is connected, the data is sent to a central data center in Colorado operated by AMS. There, the data is reviewed to determine if any monitoring "event" occurred that indicates that the wearer ingested alcohol.

24. Unlike blood alcohol monitoring that directly detects the level of alcohol present in the blood stream, Defendants' SCRAM Device relies on transdermal alcohol monitoring, which operates by detecting the amount of alcohol that evaporates through the skin. Because the rate at which alcohol evaporates through the skin is significantly different than the rate at which alcohol is metabolized and detected in the blood stream, transdermal alcohol monitoring requires the use of an algorithm to approximate the blood alcohol content of the wearer based on the amount of alcohol vapor detected at the skin surface.

25. Because transdermal alcohol monitoring measures the amount of alcohol evaporating through the wearers' skin, the SCRAM Device is by its design susceptible to detecting "false-positive" alcohol readings as a result of what Defendants term to be "environmental alcohol." That is, alcohol vapors that wearer's encounter on an everyday basis that may come in contact with the SCRAM Device. Environmental alcohols take many forms, and many everyday products contain alcohol that evaporates upon exposure to air and can trigger a SCRAM Device to detect alcohol vapors. For example, body spray, cologne, aftershave, hand sanitizer, household cleaners such as Windex, gasoline, and many other products that most individuals come across on a day-to-day basis contain alcohol that evaporates into the atmosphere.

26. Given the placement of the SCRAM Device against the wearer's skin on their or her ankle, and the fact that the SCRAM Device is designed to detect the presence of alcohol in the air surrounding the wearer, any environmental alcohol present near or around the device will lead to the device detecting the presence of alcohol vapors even if the wearer had not ingested any alcohol themselves.

27.    Defendants advertise to the public and the governmental agencies with whom they seek to work with, that the SCRAM Device is capable of determining the difference between alcohol vapors that are detected as a result of "ingested alcohol" and alcohol vapors that are detected as a result of "environmental alcohol."

28.    Further, the individuals who ultimately purchase Defendants' alcohol monitoring services, are not in any way informed that the SCRAM Device could even register any false-positive test results due to environmental alcohol before making the decision to purchase Defendants' alcohol monitoring service and submit to monitoring via the SCRAM Device. However, Defendants misrepresent the risk of false-positive test results as a result of environmental alcohol. In fact, numerous sources have documented instances of false-positive test results recorded by the SCRAM Device when the wearer was proven to have not consumed any alcohol.

29.    For example, in one instance a criminal defendant in Oakland County Michigan was fitted with the SCRAM Device as a condition of being released on bond following a car accident. Subsequently, the court was notified of three drinking episodes that were potential violations of the conditions of the bond, and a bond revocation hearing was held. However, at the hearing, the Honorable Dennis Powers of the Novi District Court determined that the SCRAM Device was in fact unreliable and that the events detected were false-positives. Specifically, according to the data recorded by the SCRAM Device, during the first drinking episode the wearer consumed alcohol for 63 consecutive hours and maintained an identical blood-alcohol level at all times—a biological impossibility. The second drinking episode was detected by the SCRAM Device at the exact same time as when the wearer was taking a breath-alcohol test that showed no presence of alcohol whatsoever. The third drinking episode was detected when the wearer was in the

1  hospital, and even though the wearer had not consumed any alcohol whatsoever,

2  the data recorded was identical to data corresponding to some who had internally

3  ingested alcohol. The court rejected the evidence presented by AMS and in

4  particular noted that "the SCRAM tether did not meet the requisite standards of

5  'reliability' or 'general acceptance' in the relevant scientific community" and that

6  "[t]he body of evidence supplied by the defendant made it clear that the readings

7  by the SCRAM tether were not necessarily the result of prolonged drinking

8  episodes."

9        30.    As another example, another criminal defendant was ordered by the

10  Court in Ramsey County Minnesota to wear the SCRAM ankle bracelet as a result

11  of a DUI related offense. The SCRAM device is worn as an ankle bracelet which

12  monitors the migration of alcohol through the offender's skin. The measurements

13  are then obtained are converted to a blood-alcohol content which is designated as

14  the TAC, which means Transdermal Alcohol Content.

15        31.    In this case, on November 9, 2006, the defendants SCRAM device

16  showed a positive reading for alcohol with a confirmed peak reading .035 TAC.

17  On November 10, 2006, at approximately 6:00 a.m., the defendants SCRAM

18  device showed a positive reading for alcohol with an alleged confirmed peak

19  reading in at .05 TAC. The defendant was notified a week later that he tested

20  positive for alcohol consumption and that a probation violation report would be

21  filed against him. The defendant was notified by their attorney and the defendant

22  got an alcohol test done through a certified medical lab and the results were

23  negative.  In the very case, just as the same facts as each of the Plaintiffs, the

24  Honorable Edward S. Wilson found SCRAM highly unreliable and based on the

25  hearing that was held, the trial Court found that SCRAM was not widely accepted

26  in the scientific community. Further, Judge Edward Wilson also determined that

27  the SCRAM device that the defendant was wearing was not in proper working

28

1    order on the dates in question. As such, the violation was dismissed.

2         32.    In a study of the accuracy of transdermal alcohol monitoring utilizing

3    the SCRAM Device, it was similarly noted that the "methodology used by AMS

4    cannot separate ethanol from other contaminating alcohols and therefore is not a

5    reliable method." This is of particular significance because ingested alcohol is

6    specifically comprised of ethanol. Thus, any device intended to measure an

7    individual's blood alcohol content that is not specific to ethanol will detect all

8    types of alcohols, including those that are not ingested by an individual. The

9    SCRAM Device utilizes "fuel cell" technology that creates an electric current

10   when an electrolyte contained within the device comes in contact with chemicals

11   that has a "hydroxyl" group. The chemicals include isopropyl alcohol (rubbing

12   alcohol), antifreeze, and many other "alcohols" such as those previously described

13   above. Because the SCRAM device is not specific to detecting ethanol, any

14   number of other alcohols that are not ingested by the wearer can result in the

15   Device registering an "alcohol" reading if they come in contact with the device.

16        33.    Because the SCRAM Device does not directly measure the wearers'

17   blood alcohol content, and is not specific to detecting ethanol, a reading by the

18   SCRAM Device detecting the presence of alcohol vapors is not by itself in any

19   way indicative that the wearer had actually consumed alcohol.  As discussed

20   above, Defendants have to apply an algorithm to determine whether any readings

21   collected by the SCRAM Device actually correspond to what Defendants term a

22   "confirmed alcohol consumption event."

23        34.    Specifically, Defendants measure the rate at which the alcohol vapor

24   readings detected by the SCRAM Device increase and decrease in order in order to

25   determine whether they match the predicted rate at which alcohol vapors are

26   released as a result of alcohol being metabolized by the human body. In applying

27   their algorithm to determine whether an "alcohol consumption event" occurred,

28

PLAINTIFFS' COMPLAINT FOR DAMAGES

Defendants rely on a general assumption that the rate at which alcohol vapor is released through the skin following the consumption of alcohol falls within a certain range for all individuals, regardless of any distinguishing physiological characteristics (i.e. weight, height, thickness of skin).

35.     Applying this algorithm, Defendants claim to be able to distinguish between alcohol vapor readings caused by "alcohol consumption events" and readings caused by "environmental alcohols," because alcohol vapor readings that are caused by environmental alcohols are supposed to have a significantly different rate at which they increase/decrease in comparison to readings that are caused by ingestion of alcohol. Because the raw data produced by the SCRAM Device is by itself of limited use in determining whether the wearer actually consumed alcohol, the data has to be sent to AMS' central monitoring facility in Colorado to be analyzed and for AMS' personnel to apply the algorithm and attempt to determine whether an "alcohol consumption event" had occurred.

36.     When a customer of Defendants' alcohol monitoring service connects their SCRAM Bracelet into the internet connected docking station each day, the data collected for that day is sent to AMS for such analysis.  If upon analyzing the data AMS determines that the alcohol vapor readings were caused by an "alcohol consumption event," Defendants inform the law enforcement agency or court exercising jurisdiction over the wearer that based on their analysis of the collected data the individual had consumed alcohol.

37.     However, the individual who was actually wearing the SCRAM Device, is not in any way informed by Defendants or by the device itself that an "alcohol consumption event" had occurred, neither at the time when the SCRAM Device is actually recording the alcohol vapor readings, nor when AMS concludes its analysis of the data and informs the law enforcement agency or the court.

38.     In fact, the SCRAM Device is not designed to, and does not actively inform the wearer in real-time when it is detecting alcohol vapors. Even if the SCRAM Device records alcohol vapor readings continuously for 24 hours, when the wearer connects the SCRAM Device to the docking station to upload the data, the SCRAM Device will simply flash a green light to inform the wearer that the upload was successful. Because the vast majority of Defendants' customers purchase the transdermal alcohol monitoring service as part of a condition of their bond or probation, a report to a law enforcement agency or judiciary that an individual has been determined to have consumed alcohol will often be considered a violation of the conditions of any such bond or probation and trigger a hearing revoking the bond/probation.

39.     However, because Defendants' customers are not timely notified when the SCRAM Device detects the presence of alcohol vapors, when the data is uploaded daily to AMS, or even when AMS sends a report stating that an "alcohol consumption event" has occurred, they often do not discovery that they had supposedly violated the conditions of their bond or probation until several days after the "alcohol consumption event" had occurred.

40.     Thus, Defendants' customers who wish to dispute any finding that they violated the terms of their bond/probation are unable to obtain evidence that could allow them to challenge the revocation of their bond/probation because by the time they are made aware of the potential violation, due to the rate of alcohol metabolism in the human body, Defendants' customers cannot obtain a timely blood or breath alcohol test that could definitively show that they did not consume alcohol at the time indicated by the SCRAM Device.

### 1.    *Anthony Oliver*

41.    Plaintiff Anthony Oliver, ("Mr. Oliver or Plaintiff"), was on the evening of February 27, 2016, driving to Camp Pendleton in San Diego California when he was pulled over by a California Highway Patrol officer. The officer suspected that Plaintiff had been drinking and performed a preliminary alcohol screening test using a handheld Breathalyzer device. The officer then placed Plaintiff under arrest for driving while under the influence.

42.    Soon after he was arrested, Plaintiff was brought to a San Diego Sheriff's police station, where he was administered another, more extensive Breathalyzer test. While unknown to him at the time, Plaintiff's blood alcohol content was recorded as being under the legal limit.

43.    Plaintiff was thereafter released, and a hearing date was set for his arraignment on the driving under the influence charge was set for April 14, 2016, at approximately 10:00 am.

44.    On April 14, 2016, Plaintiff pleaded not guilty to the driving under the influence charge. Plaintiff was given the choice of being released on bond pending further adjudication of the charges on the additional condition that he be monitored by Defendants and wear the SCRAM Device. At the time of the hearing Plaintiff was not in any way informed that the SCRAM Device is capable of detecting environmental alcohols, that there was a possibility it could detect false-positives, or that the SCRAM Device would not actually inform the Plaintiff that it had detected alcohol vapors, before Plaintiff agreed to the conditions of the bond and to purchase Defendants' monitoring services.

45.    Upon conclusion of the hearing Plaintiff was taken to the nearby jail where he was searched, relieved of his belongings, and put into a jail cell to wait for a SCRAM of California employee to arrive and attach the SCRAM Device to his ankle. Even though Plaintiff had posted his bail amount by 5:00 pm that day,

1  April 14, Plaintiff was nonetheless detained for over 12 additional hours to wait for

2  a SCRAM of California employee to arrive.

3      46.    The SCRAM of California employee eventually arrived on the

4  morning of April 15, 2016. Even though the employee did not work for any state

5  agency, court, or in law enforcement, the employee had a key to the jail cell where

6  Plaintiff was being detained.

7      47.    The SCRAM of California employee entered Plaintiff's cell so that

8  she could fulfill the conditions of Plaintiff's bond and place the SCRAM Device on

9  his left ankle, but was unable to get the SCRAM Device secured without additional

10  equipment. To get the device placed on Plaintiff, the employee "signed" Plaintiff

11  out of the jail facility so that she could escort him to her nearby office where she

12  would be able to place the SCRAM Device on Plaintiff. The employee was

13  officially given custody over Plaintiff and all of his personal belongings that were

14  taken from him before he was placed in jail.

15      48.    Upon taking custody of Plaintiff, the SCRAM of California employee

16  escorted him to her office, where she was able to fasten a SCRAM Device to his

17  left ankle.

18      49.    After Plaintiff had the SCRAM Device placed on his ankle, the

19  SCRAM of California employee had Plaintiff fill out a "Client Intake Form" and

20  asked him to provide his signature on a credit card sales receipt for a $325.00

21  payment which she stated was the initiation fee for Defendants' monitoring

22  service. When Plaintiff inquired how the employee had already obtained payment

23  for the initiation fee, the employee stated that she took Plaintiff's credit card from

24  his wallet that was given to her along with Plaintiff's other belongings when she

25  was given custody of him. Plaintiff never provided his credit card to the employee,

26  never authorized the employee to charge that particular credit card, and was

27  generally unaware that the employee had permission to search his personal

28

PLAINTIFFS' COMPLAINT FOR DAMAGES

1    belongings to find and apply any form of payment.

2        50.    Plaintiff was then led to another room where he, along with several

3    other individuals who had similarly purchased Defendants' monitoring services,

4    saw a short two to three-minute orientation video regarding the SCRAM Device

5    and general information related to maintaining the SCRAM Device and avoiding

6    any damage to it. After the video the SCRAM of California employee had a brief

7    follow-up presentation addressing the video and then talked at length about the

8    payment instructions and Plaintiff's, and the other said individuals' financial

9    obligations related to the monitoring service and the SCRAM Device. After the

10   SCRAM of California employee finished her presentation Plaintiff was released

11   from custody.

12       51.    At no time was Plaintiff provided any literature, pamphlet, brochure,

13   or any other form of documentation regarding the SCRAM Device and the

14   Defendants' transdermal monitoring service.

15       52.    Plaintiff was also never informed either through the video or by the

16   SCRAM of California employee that the SCRAM Device can potentially detect

17   false-positive alcohol readings. In fact, the SCRAM of California employee

18   actually reassured Plaintiff and the other individuals present that the SCRAM

19   Device can distinguish between alcohol vapor readings caused by ingested alcohol,

20   and those caused by environmental alcohols.

21       53.    The following week, on April 20, 2016, at approximately 6:00 pm,

22   Plaintiff visited a Burlington Coat Factory store in Murrieta California with a

23   family relative.

24       54.    While at the Burlington store, Plaintiff shopped for, among other

25   items, a body spray or cologne. After trying on one of the body sprays in the store,

26   Plaintiff purchased it for future use.

27

28

55.     That evening Plaintiff returned to the hotel where he was staying in Lake Elsinore, California at approximately 8:00 pm. Plaintiff had plans to meet with a friend in the evening for dinner in Riverside, California, and upon returning to his hotel room Plaintiff took a shower and then put on the body spray that he had purchased that same day before heading out.

56.     However, at approximately 9:00 pm, before Plaintiff had left his hotel room, he was informed that his friend was no longer available and canceled their plans for the evening. Plaintiff decided to stay in for the evening in his hotel room, and went to sleep shortly thereafter.

57.     Complying with the requirement imposed by Defendants that he connect his SCRAM Device to the internet once a day to upload the monitoring data collected, before going to sleep, at approximately 9:00 pm on April 20, 2016, Plaintiff connected his SCRAM Device to the internet connected docking station that he was provided. The docking station flashed a green light to indicate that the upload was successful, but otherwise did not provide any other information to Plaintiff regarding the data uploaded.

58.     Sometime in the afternoon on April 21, 2016, Plaintiff then again connected his SCRAM Device to the docking station, which again flashed a green light to indicate that the upload was successful.

59.     More than a week later, on or about April 29, 2016, Plaintiff received a follow up phone call from the same SCRAM of California employee who had originally placed the SCRAM Device on him and charged him the initiation fee. The employee sought to verify Plaintiff's payment information and that he would make the bi-weekly $225.00 payment that was coming due. More importantly, during this phone call the employee also informed Plaintiff, for the first time that he had violated the conditions of his bond because his SCRAM Device had detected alcohol vapors that were determined by AMS to have been caused by the

1  consumption of alcohol.

2       60.    Upon learning this information, Plaintiff immediately investigated

3  further and discovered that, much to his shock and surprise, on the evening of

4  April 20, and into the morning hours of April 21, the SCRAM Device he was

5  wearing had detected alcohol vapors.

6       61.    Plaintiff also discovered that on April 25, 2016, Defendants sent a

7  report directly to the court where his driving under the influence charge was being

8  adjudicated informing it that Defendants had analyzed the data collected from

9  Plaintiff's SCRAM Device and determined that there was a "confirmed alcohol

10  consumption event" that occurred between April 20, 2016 and April 21, 2016.

11      62.    Particularly disturbing to Plaintiff was the fact that at no point

12  between April 20, 2016 and April 21, 2016 was Plaintiff ever informed that the

13  SCRAM Device had detected alcohol vapors, that Defendants had determined that

14  an "alcohol consumption event" took place, or even that Defendants had reported

15  to the court that he had violated the conditions of his bond.

16      63.    Even though Plaintiff did not consume any alcohol at any time on

17  April 20 or April 21, by the time Plaintiff was made aware of Defendants' report

18  on April 29, it was well past the narrow 12-hour window for him to have a blood

19  alcohol test performed to conclusively prove that he did not consume any alcohol,

20  or to even obtain a urine alcohol screening that shows whether an individual had

21  consumed alcohol in the past 80 hours. Following several numerous failed

22  communications with SCRAM of California regarding how he did not consume

23  any alcohol between April 20 and April 21, and that the recorded readings must

24  have been the result of an erroneous false positive, on May 18, 2016 Plaintiff filed

25  a lawsuit against Defendants in the Southern District of California alleging various

26  claims in relation to the transdermal alcohol monitoring service he had purchased

27  from Defendants and the false-positive alcohol vapor readings that Defendants'

28

1    SCRAM Device detected and which Defendants reported to the court.

2       64.    Shortly after Plaintiff filed his federal lawsuit, the same SCRAM of

3    California employee who had originally placed the SCRAM Device on Plaintiff,

4    contacted Plaintiff and instructed him to take off the SCRAM Device. Soon

5    thereafter Defendants reported to the court where Plaintiff's case was pending that

6    they would discontinue monitoring Plaintiff.

7       65.    The transdermal alcohol monitoring report that was sent to the court

8    by Defendants without Plaintiff's knowledge showed that the supposed "alcohol

9    consumption event" occurred approximately between 9:00 pm on April 20, and

10   12:00 pm on April 21, with the "peak" alcohol vapor readings being recorded at

11   midnight on April 21.

12      66.    The alcohol vapor readings recorded by the SCRAM Device worn by

13   Plaintiff that supposedly evidenced Plaintiff consuming alcohol, directly coincided

14   with Plaintiff's use of the body spray that he had purchased earlier that day on

15   April 20, and had put on himself shortly before getting into bed to go to sleep at

16   approximately 9:00 pm.

17      67.    Because Plaintiff slept under a cover that night, the alcohol

18   evaporating from the body spray that he had put on could not dissipate into the air

19   and instead over time gradually increased in concentration under the cover.

20   Because the SCRAM Device is not specific to detecting ethanol that is contained in

21   drinking alcohol, and detects all alcohol vapors regardless of their source, the

22   gradual buildup of the alcohol vapors released from the body spray Plaintiff had

23   put on was detected, and Defendants' "algorithm" determined that the readings

24   constituted an "alcohol monitoring event" simply based on the fact that there was a

25   gradual rise and fall in the concentration of alcohol vapors detected by the SCRAM

26   Device under the cover.

27

28

68.    Even though Plaintiff was unable to obtain a timely blood alcohol or urine screening test, Plaintiff later discovered that there was another alternative form of testing that could prove that he did not in fact consume alcohol on April 20 and April 21. On June 2, 2016, Plaintiff visited a certified medical laboratory and had a hair follicle test performed that looked for any traces of the by-products of alcohol metabolism from the prior 90 days.

69.    Because hair follicles are repositories of certain chemicals that are created when the body ingests drugs or alcohol, and because of the nature of how long hair follicles remain in the scalp, a hair follicle test can be used to determine whether an individual has consumed alcohol or drugs for a much more extended period of time than a blood or urine screening test.

70.    The results of Plaintiff's hair follicle test came back negative for the presence of ethyl glucuronide, indicating that Plaintiff had not consumed alcohol on April 20 or April 21.

71.    Mr. Oliver paid a total of $1,250.00 to Scram of California for the Defendants' alcohol monitoring service.

72.    Mr. Oliver paid a total of $600.00 for a certified hair follicle test from a certified laboratory.

73.    Had Plaintiff known that the SCRAM Device registered false positive test results, did not timely inform the user when the device was detecting the presence of alcohol vapors, was unable to distinguish between environmental alcohols and ingested alcohol, and that Defendants would not timely inform Plaintiff once they had determined that an alcohol monitoring event occurred, Plaintiff would have never agreed to purchase Defendants' alcohol monitoring service as a condition of his bond, and would have petitioned the court for an alternative means of monitoring.

### 2.    *James Kyle*

74.    Plaintiff James Kyle, ("Mr. Kyle or Plaintiff"), on the evening of May, 11, 2016, was returning from a concert with his wife. As Mr. Kyle was attempting to make a turn at the light, Mr. Kyle had a yellow light and decided to still make the turn. Moments later, Mr. Kyle and his wife were subsequently sideswiped by another vehicle causing a large accident in the City of El Cajon. Shortly thereafter, police were called to the scene of the accident and began conducting field sobriety tests, ("FST's") on Mr. Kyle after police suspected that Mr. Kyle was under the influence. The police officer on scene indicated that Mr. Kyle was under the influence and thereafter placed him under arrest for suspicion of driving under the influence. Police then transported Mr. Kyle to the police station where Mr. Kyle was able to post bond.

75.    After posting bond, Mr. Kyle was provided with a Court to appear in San Diego Superior Court. During that time, Mr. Kyle retained a private attorney and defended against the DUI charge and appear in Court. During his arraignment, a San Diego Superior Court judge ordered Mr. Kyle to wear the SCRAM Device and a condition of release. On February 5, 2016, Mr. Kyle was enrolled in the SCRAM program and continued to be monitored by SCRAM until Mr. Kyle was ordered discharged.

76.    On April 2, 2016, Defendant SCRAM contacted Mr. Kyle and informed him for the very first time that Mr. Kyle was allegedly in violation of his SCRAM conditions. Mr. Kyle was informed that Defendants SCRAM and AMS received a "confirmed consumption" and that SCRAM and AMS would be preparing a violation report and sending that report to the Court where Mr. Kyle's DUI criminal case is pending.

77.    On April 12, 2016, a partial hearing was held by San Diego Superior Court Judge Michael Groch. At that hearing, Judge Groch remanded Mr. Kyle to custody based on the report that was produced by SCRAM and AMS. The

following day, Mr. Kyle posted a new bail bond in the amount of $ 300,000. As

such, Mr. Kyle paid a total of $ 16,000 to a bail bondsman. The following day, Mr.

Kyle knowing that he did not consume any alcohol discovered that he had a

remedy available to him, Mr. Kyle visited a certified medical laboratory and

conducted a urine test. Plaintiff was later informed that the results of the urine test

were in fact negative.  Because the SCRAM Device is not specific to detecting

ethanol that is contained in drinking alcohol, and detects all alcohol vapors

regardless of their source, the gradual buildup of the alcohol vapors released in the

environment, Defendants' "algorithm" determined that the readings constituted an

"alcohol monitoring event" simply based on the fact that there was a gradual rise

and fall in the concentration of alcohol vapors detected by the SCRAM Device

under the cover.

78.     The results of Plaintiff's urine test came back negative for the

presence of ethyl glucuronide, indicating that Plaintiff had not consumed alcohol

on April 2, 2016. Several days later, SCRAM sent Plaintiffs attorney copies of the

SCRAM report. The very consumption report that the Defendants' SCRAM and

AMS orchestrated, turned out to be false. In fact, the SCRAM employee turned

over copies of an emails from SCRAM to the Superior Court. In that very email

from the SCRAM employee, the email states that Mr. Kyle not only tampered with

the SCRAM device, but also that [Alcohol was detected during this same time

period][emphasis in original].

79.     To further show that the Defendants products are flawed and corrupt,

the SCRAM Defendants contradicted themselves. In yet another report that was

generated by the SCRAM Defendants, an employee prepared a SCRAM violation

report that the Plaintiff had now tampered with the SCRAM Device and in this

new report, the SCRAM employee now states for the very first time that SCRAM

Device had detected no consumption of alcohol. This clearly now contradicts what

the SCRAM Defendants and employees testified about to in Mr. Kyle's underlying

criminal case. The Defendants and employees are so corrupt that SCRAM and their employees were unable to piece together their stories, much less make the pieces of the puzzle fit to overcome the facts that Mr. Kyle did not consume any alcohol as the Defendants false and misleading statements of Mr. Kyle using alcohol was in fact refuted by scientific evidence.

80.    On May 31, 2016, Mr. Kyle appeared at sentencing for his original DUI criminal matter. While at the hearing, a SCRAM employee appeared and testified at the sentencing for the Court on behalf of SCRAM. The employee testified in Court that the SCRAM and AMS ankle bracelet can in fact tell the difference between actual alcohol consumption and a person using actual environmental products that contain alcohol ingredients. Further, the SCRAM employee testified that the SCRAM and AMS ankle bracelet has been accepted into the scientific evidence community even though it was not. The SCRAM employee clearly not only committed perjury in Mr. Kyle's underlying sentencing, but also provided a bias testimony.

81.    Coincidentally, the SCRAM employee was the case manager that Mr. Kyle was required to report to for SCRAM monitoring. In fact, this was the very same employee that Mr. Kyle continued to complain to about the costs of SCRAM monitoring.

82.    Mr. Kyle paid a total of $ 2,400.00 to Scram of California for their said corrupt Defendants alcohol monitoring service.

83.    Mr. Kyle paid a total of $ 650.00 for a certified urine test from a state certified laboratory.

84.    Additionally, Ms. Oh also paid $ 1,000 for attorney fees to her private attorney to defend against the alleged SCRAM violation.

85.    Had Mr. Kyle known or been aware that the SCRAM Device registered false positive test results, did not timely inform the user when the device was detecting the presence of alcohol vapors, and that Defendants AMS and

SCRAM would not timely inform Mr. Kyle once they had determined that an alleged alcohol monitoring event occurred, he would have never agreed to purchase Defendants alcohol corrupt monitoring service as a condition of his bond, or would have tried to locate another AMS and SCRAM monitoring company.

## ADDITIONAL FACTS

86.     Since 2010, a few years after the State Defendants entered into a said written contract with the Corporate Defendants, over 50,000 criminal Defendants, innocent people, and citizens have been sent back to jail due to the corrupt and false device that SCRAM and AMS have produced, and continue to produce. Even though Defendants BROWN and HARRIS have been placed on advance notice that SCRAM and AMS produce products that result in wrongful convictions and jail time, BROWN and HARRIS continue to look the other way and continue to operate on the "good ole boy system."

87.     To date, SCRAM and AMS have created their own police, probation and parole systems. In which SCRAM and AMS have taken over and granted not only immunity for everything they do, but also continue to make "heavy" campaign contributions to Judges and District Attorneys nationwide.  Both AMS and SCRAM does anything they want and they do anything that strikes their fancy.

88.     Plaintiffs inability to have the contract severed between the State Defendants and the Corporate Defendants has caused them significant hardship including but not limited to the deprivation of rights guaranteed by the Fourteenth Amendment and among other things, severe humiliation, emotional distress, pain, suffering, psychological harm, and stigma. Each day that the Plaintiffs and others are placed on SCRAM and AMS, suffer irreparable harm as a direct result of the State and Corporates Defendants contract that amounts to violations of their said and well established constitutional rights.

89.     If the contract between the State and Corporate Defendants are not enjoined, Defendants SCRAM and AMS will not only continue to incarcerate innocent people, but will continue their criminal and despicable unconstitutional law against Plaintiffs and all other innocent people, thereby depriving them of their constitutional rights under the Fourteenth Amendment. More often then not, due to the reports filed by SCRAM and AMS with the Courts, the trial Court will almost every time issue a bench warrant in chambers without ever even holding a hearing to determine whether or not the SCRAM and AMS wearer is actually in violation of their SCRAM conditions without ever coming to realize that it is well known that the SCRAM Device, which is just like a cell phone, computer, iPad, iPod, and other electronics, breaks down, doesn't work anymore, and simply needs to be fixed. In this case, SCRAM and AMS almost never fix, maintenance, or calibrate their corrupt devices.

90.     The declaratory and injunctive relief sought by Plaintiffs, on the other hand, will require Defendants BROWN and HARRIS to revise and/or severe their contracts with SCRAM and AMS. The relief sought also will require the Corporate and State Defendants to recognize that the SCRAM Device is corrupt and false, and the contract between the parties need to be investigated by the United States Grand Jury foreperson for the Central District of California, Mr. John Medina.

PLAINTIFFS' COMPLAINT FOR DAMAGES

## PLAINTIFF'S FIRST CAUSE OF ACTION

### (Due Process – 14th Amendment United States Constitution)

### Plaintiffs v. All Defendants

91.     Plaintiffs incorporate herein by all said referenced paragraphs as if fully set forth herein.

92.     The written contracts between the State Defendants and the Corporate Defendants violates fundamental liberties that are protected by the Due Process Clause, both on its face and as applied to Plaintiffs.

93.     The contracts between the Defendants, and each of them, impinges on fundamental liberties by denying persons and Defendants a hearing to determine whether or not the actual wearer has violated terms of their SCRAM conditions. For example, Defendants SCRAM and AMS routinely send false reports to the Superior Court of California for various reasons that almost never have anything to do with actual consumption of alcohol. In fact, almost every report that is sent to the Court is due to failure to pay SCRAM and AMS for their monitoring services, complaining about high end exuberant fees, or failure to lie for SCRAM staff in order to gain contracts with other government agencies, thereby denying the due process rights of the accused.

## PLAINTIFF'S SECOND CAUSE OF ACTION

### (Violation of Federal Civil Rights – 42 U.S.C § 1983)

### Plaintiffs v. All Defendants

94.     Plaintiffs incorporate herein by all said referenced paragraphs as if fully set forth herein.

95.     Insofar as they are enforcing the contracts between each of the Defendants, acting under color of state law, are depriving and will continue to deprive Plaintiffs of numerous rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C § 1983.

## **IRREPARABLE INJURY**

96.     Plaintiffs incorporate herein by all said referenced paragraphs as if fully set forth herein.

97.     Plaintiffs are now severely and irreparably injured by the contract that is currently in play between each of the Defendants. The contract among the said Defendants violates the well-established Due Process and Equal Protection Clauses of the Fourteenth Amendment.

98.     By way of example only, Plaintiffs' injury includes the deprivation of rights guaranteed by the well-established Fourteenth Amendment and the severe humiliation, emotional distress, pain, suffering, psychological harm, and stigma.

99.     The Plaintiffs' injuries will be redressed only if this Court declares that the contract with the State and Corporate Defendants are unconstitutional and enjoins the Defendants from continuing to enforce the said written contract.

100.     Even in the face of conclusive evidence that people and criminal Defendants are innocent, Defendants, and each of them continue to conceal their lies, incompetence, and violations of Constitutional Rights causing all citizens of the State of California further pain, suffering, and days, if not years in jail all while the Corporate Defendants SCRAM and AMS stuff their wallets with billions of dollars each day. They are incredulous in their actions, claiming that their device can tell the difference between consumption of alcohol, and environmental products with alcohol. In point of fact, however, the justice systems failed to protect innocent persons against the financial greed and ambitions of in-concert government agents who again, continue to stuff their wallets with billions of dollars each day, who used the State Defendants to obtain the power and trust under color of law to deprive the Plaintiffs and other citizens their constitutional rights. Were it not for Anthony Oliver, and his proclamation and pursuit of innocence and unwillingness, innocent people would still be rotting away in a jail cell somewhere.

101.   Mr. Oliver spends his time and financial resources to traveling the globe to testify as an expert and advisor in alleged SCRAM violations all over the Country.

## PLAINTIFF'S THIRD CAUSE OF ACTION

### (Permanent Injunction)

### Plaintiffs v. All Defendants

102.   Plaintiffs incorporate herein by all said referenced paragraphs as if fully set forth herein.

103.   Defendants wrongful conduct as alleged, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to yjr said Plaintiffs and all similarly situated individuals.

104.   Plaintiffs and all other similarly situated individuals have no adequate remedy at law for their injuries. The Defendants are unrestrained in their ability to waste hard earned taxpayer money, and can escape liability by using the great governmental power and resources entrusted to them by the People of the State of California. If left unfettered, Defendants, and each of them, can systematically and continuously violate the Constitutional rights of individuals, including Plaintiffs.

105.   There are absolutely no countervailing benefits to violating the well-established Constitutional rights of individuals, and as long as Defendants are allowed to continue to investigate, incarcerate, and wrongfully brutally assault persons in their custody for their own personal greed and selfish ambitions, the public, including the Plaintiffs, will continue to be irreparably harmed.

106.   Therefore, the Court should order the State Defendants to terminate their contract with SCRAM and AMS until further investigations against the SCRAM and AMS Defendants are prevented to continued violations of the Plaintiffs and all other similarly situated person's rights guaranteed by the United States Constitution.

PLAINTIFFS' COMPLAINT FOR DAMAGES

107.  Therefore, the Court should order the California Attorney General, and the United States Attorney to investigate the SCRAM and AMS Defendants to ensure that they have not violated the laws of the State of California.

108.  Therefore, the Court should, as requested by Plaintiff Anthony Oliver, order the United States Grand Jury foreperson for the Central District of California, Mr. John Medina to issue a federal indictment against the SCRAM and AMS Defendants;

109.  Furthermore, the Court should order the Defendants BROWN and HARRIS and Superior Court of California (by and through its agents, judicial officers and employees of the State) to require their agents, judicial officers and employees to undergo additional and mandatory training and testing to ensure their agents, judicial officers and employees understand and comply with their legal duties as officers of the Court to ensure that the rights of the accused shall not be abridged due to the Defendants SCRAM and AMS. These conditions, procedures, policies and conditions are complied with under State and Federal law. All persons and Defendants who are charged with an alleged SCRAM violation are entitled to an evidentiary hearing to prior to the issuance of an arrest warrant.

/ / /

/ / /

/ / /

PLAINTIFFS' COMPLAINT FOR DAMAGES

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs Anthony Oliver and James Kyle pray for judgment as follows:

1.      Therefore, the Court should order the State Defendants to terminate their contract with SCRAM and AMS until further investigations against the SCRAM and AMS Defendants are prevented to continued violations of the Plaintiffs and all other similarly situated person's rights guaranteed by the United States Constitution.

2.      Therefore, the Court should order the California Attorney General, and the United States Attorney to investigate the SCRAM and AMS Defendants to ensure that they have not violated the laws of the State of California.

3.      Therefore, the Court should, as requested by Plaintiff Anthony Oliver, order the United States Grand Jury foreperson for the Central District of California, Mr. John Medina to issue a federal indictment against the SCRAM and AMS Defendants;

4.      Furthermore, the Court should order the Defendants BROWN and HARRIS and Superior Court of California (by and through its agents, judicial officers and employees of the State) to require their agents, judicial officers and employees to undergo additional and mandatory training and testing to ensure their agents, judicial officers and employees understand and comply with their legal duties as officers of the Court to ensure that the rights of the accused shall not be abridged due to the Defendants SCRAM and AMS. These conditions, procedures, policies and conditions are complied with under State and Federal law. All persons and Defendants who are charged with an alleged SCRAM violation are entitled to an evidentiary hearing to prior to the issuance of an arrest warrant.

5.      Plaintiffs Anthony Oliver and James Kyle respectfully request that this Court, pursuant to 42 U.S.C. § 2201, construe the contract between the Corporate and State Defendants and enter a declaratory judgment stating that this

1  contract and any other California law that continues to recognize this contract

2  violates the Due Process and Equal Protection Clauses of the Fourteenth

3  Amendments to the United States Constitution and 42 U.S.C. § 1983.

4        6.    Plaintiffs Anthony Oliver and James Kyle request that this Court enter

5  a preliminary and a permanent injunction enjoining enforcement or applications of

6  the contract with the State Defendants.

7        7.    Plaintiffs Anthony Oliver and James Kyle request costs of suit, and all

8  other further relief to which they may be justly entitled.

9

10 Respectfully submitted,

11 Dated:      January 11ᵗʰ, 2017    By: _____

12                             Anthony Oliver, Plaintiff Pro Se

13                             1717 McKinney Avenue, Suite # 700

14                             Dallas, Texas, 75202

15                             (818) 624-2504 (telephone)
                            (818) 227-5030 (facsimile)

16 Respectfully submitted,

17 Dated:      January 11ᵗʰ, 2017    By: _____

18                             James Kyle, Plaintiff Pro Se

19                             1400 Greenfield Avenue, # 140

20                             El Cajon, California 92021
                            (760) 622-4400 (telephone)
                            (818) 227-5030 (facsimile)

21

22

23

24

25

26

27

28

PLAINTIFFS' COMPLAINT FOR DAMAGES

## JURY TRIAL DEMANDED

Plaintiffs Anthony Oliver and James Kyle is entitled to, and demands, a trial by jury pursuant to Seventh Amendment to the United States Constitution.

Respectfully submitted,

Dated:        January 11th, 2017        By: _____

Anthony Oliver, Plaintiff Pro Se
1717 McKinney Avenue, Suite # 700
Dallas, Texas, 75202
(818) 624-2504 (telephone)
(818) 227-5030 (facsimile)

Respectfully submitted,

Dated:        January 11th, 2017        By: _____

James Kyle, Plaintiff Pro Se
1400 Greenfield Avenue, # 140
El Cajon, California 92021
(760) 622-4400 (telephone)
(818) 227-5030 (facsimile)

PLAINTIFFS' COMPLAINT FOR DAMAGES

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☒ )

ANTHONY OLIVER, an individual; JAMES KYLE, an individual;

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Scram of California, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff  Dallas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Los Angeles
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.
Anthony Oliver, Plaintiff Pro Se
1717 McKinney Avenue, Suite # 700
Dallas, Texas, 75202
818-624-2504

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

Unknown

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multidistrict Litigation - Transfer

☐ 8. Multidistrict Litigation - Direct File

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☐ No   ☐ **MONEY DEMANDED IN COMPLAINT:** $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

42 U.S.C. 1983 - Violation of Federal Civil Rights

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 376 Qui Tam (31 USC 3729(a)) | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 400 State Reapportionment | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 410 Antitrust | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 430 Banks and Banking | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 450 Commerce/ICC Rates/Etc. | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 460 Deportation | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 480 Consumer Credit | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 850 Securities/Commodities/Exchange | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 891 Agricultural Acts | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 893 Environmental Matters | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☒ 440 Other Civil Rights | **LABOR** | |
| ☐ 895 Freedom of Info. Act | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 896 Arbitration | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number:   CV 17 -00237

CV-71 (07/16)   CIVIL COVER SHEET   Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII.  VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| ☐ Yes  ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | | Western |
| If "no," skip to Question B.  If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | | Southern |
| | ☐ Riverside or San Bernardino | | Eastern |

| QUESTION B:  Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1.  Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO.  Continue to Question B.2. |
| If "no," skip to Question C.  If "yes," answer Question B.1, at right. | B.2.  Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO.  Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C:  Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1.  Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes  ☒ No | | ☐ NO.  Continue to Question C.2. |
| If "no," skip to Question D.  If "yes," answer Question C.1, at right. | C.2.  Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties?  (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES.  Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO.  Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D:  Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside.  (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| D.1.  Is there at least one answer in Column A? | D.2.  Is there at least one answer in Column B? |
|---|---|
| ☐ Yes  ☐ No | ☐ Yes  ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. | If "yes," your case will initially be assigned to the EASTERN DIVISION. |
| Enter "Southern" in response to Question E, below, and continue from there. | Enter "Eastern" in response to Question E, below. |
| If "no," go to question D2 to the right. ➡ | If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes  ☒ No |

CV-71 (07/16)                     CIVIL COVER SHEET                     Page 2 of 3

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:**  Has this action been previously filed **in this court?**   ☒ NO   ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:**  Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**
                                                                                 ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are related when they** (check all that apply):

☐  A.  Arise from the same or a closely related transaction, happening, or event;

☐  B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐  C.  For other reasons would entail substantial duplication of labor if heard by different judges.

Note:  That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case are related when they** (check all that apply):

☐  A.  Arise from the same or a closely related transaction, happening, or event;

☐  B.  Call for determination of the same or substantially related or similar questions of law and fact; or

☐  C.  Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X.  SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____        DATE: 1 – 11 – 17

**Notice to Counsel/Parties:**  The submission of this Civil Cover Sheet is required by Local Rule 3-1.  This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  For more detailed instructions, see separate instruction sheet (CV-071A).

---

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |